IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Lillian Caudill, et al.,

      Plaintiffs,          Case No. 2:04-cv-695

      v.                 JUDGE GRAHAM

Lancaster Bingo Company,     Magistrate Judge King
Inc., et. al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On July 30, 2004, Lillian Caudill, Erik Lewis, Joy Lewis, Michael Rombke, and Teresa Waugh, ("plaintiffs") filed suit asserting both federal and state law claims against Lancaster Bingo Company ("LBC"), Mark Sells, Jonathan Smith, Matthew Dodds, Richard Fraxier, and Doid McCandish (collectively "defendants").[1] Plaintiffs allege violations of the Sherman Act, 15 U.S.C. §1, and under Ohio law, plaintiffs allege claims based on unreasonable restraint of trade, fraudulent inducement, and civil conspiracy. This case is before the court on defendants' motion for judgement on the pleadings with respect to plaintiffs' federal claims and defendants' motion for partial summary judgment with respect to plaintiffs' state law fraudulent inducement claims. The court will first discuss defendants' motion for judgment on the pleadings.

---

[1] Plaintiffs' complaint brings claims on behalf of themselves and a class of similarly situated individuals, however, plaintiffs have not moved for class certification and the court has made no determination as to the suitability of this case for class action treatment.

1

## I.  Standard of Review

A motion for judgment on the pleadings pursuant to Rule 12(c) "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See also Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998) ("The standard of review applicable to a Rule 12(c) motion is the same as that for a Rule 12(b)(6) motion.")(Citation omitted). All well-pleaded allegations must be taken as true and must be construed most favorably toward the non-movant. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A motion for judgment on the pleadings is directed solely to the complaint and any exhibits attached to it. Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983). The merits of the claims set forth in the complaint are not at issue on a motion for judgment on the pleadings. Consequently, a complaint will be dismissed pursuant to Rule 12(c) if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief. See Rauch v. Day & Night Mfg. Corp., 576 F.2d 697, 702 (6th Cir. 1978); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). However, the court "need not accept as true legal conclusions or unwarranted factual inferences." Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) (citations omitted).

## II.    Background

Plaintiffs' complaint contains the following allegations, all of which are accepted as true for the purpose of defendants' motion for judgment on the pleadings.  Plaintiffs are former employees of Mr. Bingo, an Ohio corporation engaged in the business of distributing bingo and gaming supplies to charitable organizations. Plaintiffs' duties included soliciting and servicing clients and customers of Mr. Bingo.  Until 2003, Mr. Bingo competed against defendant LBC.

On June 30, 2003, LBC entered into a stock purchase agreement for the acquisition of Mr. Bingo.  That same day, as a material part of the stock purchase agreement, Mr. Bingo's managers Larry Parr ("Parr") and Ken Kramer ("Kramer") entered into employment agreements with LBC.  As part of their employment agreements, Parr and Kramer retained responsibility for the hiring and firing of employees in the Dayton, Ohio, region.  Parr and Kramer are not plaintiffs in this suit.

LBC representatives met with the plaintiffs in this case to discuss the acquisition.  LBC provided each plaintiff with a package of documents related to their future employment with LBC. One of the documents in the package was a non-competition agreement which LBC required as a condition of employment.  The non-competition agreement prohibited competition with LBC in the distribution of bingo and gaming supplies in any of the ten states

3

in which LBC did business for two years after termination of employment with LBC.

Plaintiffs refused to sign the non-competition agreements. LBC representatives then provided plaintiffs with the employment agreements of Parr and Kramer and represented to them that Parr and Kramer would have total control over former Mr. Bingo operations, including sole authority over all former Mr. Bingo employees. Plaintiffs then signed the non-competition agreements.

Plaintiffs allege that at the time they were made, LBC had no intention of honoring the stock purchase agreements, the Parr and Kramer employment agreements, and the other agreements that were made when LBC acquired Mr. Bingo. Further, plaintiffs allege that LBC never provided Parr, Kramer, or any of the plaintiffs with trade secrets, customer lists, or other proprietary information other than that which they already possessed from their work at Mr. Bingo.

Plaintiffs further allege that after acquiring Mr. Bingo, LBC hindered plaintiffs in qualifying for bonuses by intentionally interfering with Parr, Kramer, and plaintiffs' ability to complete sales and grow the business. On January 6, 2004, Parr and Kramer were placed on leave. The "spurious and baseless" grounds for the leave were that Parr and Kramer had intentionally engaged in illegal activity and failed to disclose this conduct while negotiating the sale of Mr. Bingo to LBC.

4

On April 14, 2004, LBC filed a civil action in the Fairfield County Court of Common Pleas against Kramer and the former shareholders of Mr. Bingo, one of whom was Parr.  In that Fairfield County action, LBC alleged that the shareholders breached the stock purchase agreement, that Parr and Kramer breached their employment agreements, and that they civilly conspired and aided and abetted fraud.  Parr and Kramer were fired the following day and LBC has refused to pay the former shareholders of Mr. Bingo the full amounts due under the stock purchase agreement.

In this federal action, plaintiffs allege that the state court action by LBC is "sham litigation" done in furtherance of LBC's efforts to fraudulently acquire the business of Mr. Bingo without payment.  Plaintiffs claim that the non-competition agreements, signed as a condition of employment with LBC, violate the Sherman Act, are unreasonable restraints on trade, and were fraudulently induced.  Moreover, plaintiffs allege that defendants engaged in acts of civil conspiracy.  In addition to damages, plaintiffs seek a declaratory judgement that the non-competition agreements are unenforceable.

## III.  Discussion

Defendants move for judgment on the pleadings on the Sherman Act claims under two different theories.  First, defendants argue plaintiffs failed to successfully plead essential elements of a

Sherman Act violation, and second, that plaintiffs lack standing to assert a Sherman Act claim.

**(A)      Failure to Plead Essential Elements.**

Defendants argue that a violation of §1 of the Sherman Act has not been properly plead because plaintiffs failed to allege that the non-competition agreements have an adverse effect on competition.  Plaintiffs counter that while such an allegation is usually required, it is not necessary here because the non-competition agreements are *per se* illegal under the Sherman Act.  Thus, this court must first decide whether the non-competition agreements, as plead, are *per se* illegal.  If they are, then plaintiffs are not required to allege anticompetitive effects.

**1.      The Non-competition Agreements are Not *Per Se* Illegal.**

Section 1 of the Sherman Act was enacted to prohibit unreasonable restraints of trade.  <u>Board of Trade of City of Chicago v. United States</u>, 246 U.S. 231, 238 (1918).  In determining whether a restraint on trade is unreasonable, two separate levels of scrutiny are used.

Some activities are so predominantly anticompetitive that they are *per se* illegal.  <u>Broadcast Music Inc. v. Columbia Broadcasting System, Inc.</u>, 441 U.S. 1, 19-20 (1979).  When faced with such a flagrant anticompetitive act, courts will not even consider the circumstances surrounding the restraint to determine its

6

reasonableness.  No further consideration is needed because:

> the pernicious effect on competition and lack of
> any redeeming virtue are conclusively presumed to
> be unreasonable and therefore illegal without
> elaborate inquiry as to the precise harm they have
> caused or the business excuse for their use.

See Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5
(1958).  Examples of *per se* illegal activities include price
fixing, horizontal market divisions, tying arrangements, and group
boycotts.  All Care Nursing Services Inc. v. High Tech Staffing
Services, 135 F.3d 740, 746 (11th Cir. 1998).

Condemnation *per se* is an unusual step, one that depends on
confidence that a "whole category of restraints" is so likely to be
anticompetitive that there is no need to search for a potentially
beneficial instance.  Polk Bros., Inc. v. Forest City Enterprises,
Inc., 776 F.2d 185, 189 (7th Cir. 1985).  A court must be sure that
the entire category of acts is anticompetitive before "condemning
that category per se."  See id.

In contrast, most trade restrictions do not qualify under the
*per se* rule, but are instead scrutinized under the rule of reason.
Arizona v. Maricopa County Medical Society, 457 U.S. 332, 343
(1982).  Under the rule of reason, the court must determine whether
the specific restrictive practice at issue imposes an unreasonable
restraint on competition.  Id.

Courts have consistently held that non-competition agreements
are not *per se* illegal, and therefore, must be analyzed under the

7

rule of reason. As noted by the Eleventh Circuit:

> Ever since the decision of the Supreme Court in
> <u>United States v. Addyston Pipe & Steel Co.</u>, 85
> F.271 (6th Cir. 1898), modified 175 U.S. 211, 20
> S.Ct. 96, 44 L.Ed. 136 (1899), there has been an
> unbroken line of cases holding that the validity of
> covenants not to compete under the Sherman Act must
> be analyzed under the rule of reason.

<u>See</u> <u>Consultants & Designers, Inc. v. Butler Service Group, Inc.</u>,
720 F.2d 1553, 1560-1561 (11th Cir. 1983). <u>See also</u> <u>Perceptron,</u>
<u>Inc. v. Sensor Adaptive Machines, Inc.</u>, 221 F.3d 913, 919 (6th Cir.
2000)("the parties agree 'the legality of noncompetition covenants
ancillary to a legitimate transaction must be analyzed under the
rule of reason.' (Citations omitted)); <u>Verson Wilkins Limited v.</u>
<u>Allied Products Corporation</u>, 723 F.Supp. 1, 6 (N.D. Ill.
1989)("Non-competition agreements do not fall within the category
of restraints for which evaluation under the *per se* rule would be
appropriate. Quite simply, '[l]egitimate reasons exist to uphold
noncompetition covenants even though by nature they necessarily
restrain trade to some degree. The recognized benefits of
reasonably enforced noncompetition covenants are by now beyond
question.' <u>Lektro-Vend</u>, 660 F.2d at 265.");

In this case, the non-competition agreements arose from
plaintiffs' employment relationships. Courts have held under
similar circumstances that covenants not to compete shall be
subject to the rule of reason. <u>United States v. Empire Gas</u>
<u>Corporation</u>, 537 F.2d 296 (8th Cir. 1976); <u>Alders v. AFA Corporation</u>

of Florida, 353 F.Supp. 654 (S.D. Fla. 1973).

In Empire Gas, the United States brought a civil action against Empire Gas for Sherman Act violations in connection with thousands of covenants not to compete. The covenants were obtained from companies that Empire Gas purchased and its own employees. With respect to the employees' covenants, the court applied the rule of reason, saying:

> Employee covenants not to compete prohibit the employee from competing after his employment is terminated. Such agreements must also be reasonably limited in area and duration.... [M]oreover, it must usually be shown that the employee was in a position to obtain valuable personal contacts or trade secrets because of his employment which might be lost to the employer if the employee entered into competition.... Covenants of these two types have not generally been considered violative of the antitrust laws.

See Empire Gas, 537 F.2d at 307.

The court's discussion in Empire Gas evidences a rule of reason analysis. In Alders, the court is more direct, characterizing a former employee's argument that a non-competition agreement is a *per se* violation of the Sherman Act as "totally without merit." See Alders, 353 F.Supp. at 654.

Plaintiffs, in their memorandum contra, argue against this wealth of authority, and maintain that the non-competition agreements in this case are *per se* illegal because they serve no legitimate business purpose and are naked restraints on

9

competition.  See Plaintiff Memorandum Contra at 5-6.  According to plaintiffs' complaint, the non-competition agreements serve no legitimate business purpose because they were fraudulently induced. See Plaintiffs Memorandum Contra at 6. (Alleging that "LBC had no intention of fulfilling the agreements it entered into in connection with its acquisition of Mr. Bingo" and that defendants' intent was to "usurp the business of Mr. Bingo without payment in order to eliminate as competitors Mr. Bingo and the former Mr. Bingo shareholder and employees.")

Plaintiffs' argue that because defendants never intended to honor the agreements, they operate as naked restraints on competition.  Naked restraints are restrictions on competition unaccompanied by new production or products, as opposed to ancillary restraints, which are part of a larger endeavor whose success they promote.  Polk Bros., 776 F.2d at 188-189.  As the court in Polk Bros. explained:

> If two people meet one day and decide not to compete, the restraint is "naked"; it does nothing but suppress competition.  If A hired B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is "ancillary."... The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties.

See id. at 189.

Plaintiffs' allegations fail to justify a departure from the well-settled rule that non-competition agreements, specifically

those arising from an employee-employer relationship, must be analyzed under the rule of reason. Plaintiffs admit that the non-compete agreements were signed as a condition of employment with LBC, and that plaintiffs were employed by LBC and had primarily responsible for client contacts and services. Therefore, contrary to plaintiffs' assertion, the non-competition agreements were ancillary to a larger endeavor, plaintiffs employment with LBC.

Plaintiffs' arguments supporting their claim that the non-competition agreements are unreasonable all stem from the alleged fact that the agreements were fraudulently obtained. Assuming this is true, the non-competition agreements are unenforceable for that reason. But a fraudulently obtained non-competition agreement does not necessarily violate the Sherman Act. The Sherman Act only prohibits unreasonable restraints on trade that have an adverse effect on competition. The Sherman Act does not declare invalid reasonable restraints on trade that happen to be illegal based upon the methods used to obtain the agreements. The facts as alleged do not justify the declaration that non-compete agreements, as a category of restraints, are *per se* unreasonable. Therefore, to successfully state a claim under §1 of the Sherman Act, plaintiffs must allege that the non-competition agreements had an adverse effect on competition.

This ruling is consistent with the Eleventh Circuit's decision that the rule of reason analysis is designed specifically for

11

determining whether a legitimate business purpose exists for enforcing non-compete agreements. Consultants & Designers, 720 F.2d at 1561. The plaintiffs in Consultants & Designers, similar to the plaintiffs here, argued that their employment covenants were invalid as *per se* violations because no legitimate business purpose existed for enforcing them. The court rejected plaintiffs claim saying:

> The per se rule ... is to be applied, however, only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability under the Sherman Act. The per se doctrine has developed to deal with those economic practices that are clearly in violation of the letter and spirit of the Sherman Act ... and should not be extended to restraints of trade that are of ambiguous effect. [citation omitted]. To use the per se rule as a means of avoiding a rule of reason analysis when it is unclear what the result would be under the rule of reason would subvert the intention and purpose of the per se rule.

See Consultants & Designers, 720 F.2d at 1561.

As discussed above, there is nothing inherently anticompetitive about a non-competition agreement between an employer and an employee who is primarily responsible for client contact and services. Therefore, a *per se* finding of illegality under the Sherman Act is unjustified.

**2. Allegations of an Adverse Effect on Competition.**

Having determined that the non-competition agreements should

12

be analyzed under the rule of reason, this court must now determine whether plaintiffs have sufficiently alleged a claim under §1 of the Sherman Act. Plaintiffs must allege: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. Crane v. Shovel Sales Corporation v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir. 1998) (citing Davis-Watkins Co. v. Service Merchandise, 686 F.2d 1190, 1195-1196 (6th Cir. 1982)).

At issue is the second element, whether plaintiffs have properly alleged anticompetitive effects within the relevant product and geographic market. The failure to allege an adverse effect on competition is fatal to a Sherman Act cause of action. Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 554 (7th Cir. 1980); Blane v. Meineke Discount Muffler Shops. Inc., 670 F.Supp. 1107, 1113 (D. Ct. 1987). As stated in Consultants & Designers:

> The first step in establishing an unreasonable restraint of trade is to show anticompetitive effect, either in intrabrand or interbrand markets.... Absent anticompetitive effect, an unlawful intent will not establish a rule of reason violation, Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S. Ct. 242, 62 L.Ed.683

13

(1918), nor will the use of unfair methods of competition. See Consultants & Designers, 720 F.2d at 1561 (citing H&B Equipment Co., v. International Harvester Co., 577 F.2d 239, 246 (5th Cir. 1978)).

Plaintiffs must allege an injury to the market, not just a personal injury. "An anticompetitive effect must be judged in relation to a market, for it is in that conceptual space that competition takes place." See Consultants & Designers, 720 F.2d at 1562. See also Dial A Car, Inc., v. Transporation, Inc., 82 F.3d 484, 486 (D.C. Cir. 1996)(citing Brunswick Corp. v. Peublo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977))("Because the anti-trust laws 'were enacted for the protection of competition, not competitors' appellant must allege facts that would show an anticompetitive impact on the market as a whole"); Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2nd Cir. 1993)("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.")

Plaintiffs' complaint is void of any allegation as to how the market has changed or been damaged as a result of their inability to compete. The complaint fails to identify any competitors, it does not describe the market, nor does it discuss any market conditions. Further, plaintiffs' memorandum contra does not

14

dispute defendants' claim that no adverse effect on competition has resulted from these agreements.  Rather, plaintiffs simply rely on their position that the agreements are *per se* illegal, an argument that this court has rejected.  Because plaintiffs have failed to properly plead an essential element of a Sherman Act claim, namely, that the non-competition agreements have had an adverse effect on competitiveness in the market, defendants' motion for judgment on the pleadings shall be granted.

**B.   Plaintiffs lack standing to assert antitrust claims.**

Judgment on the pleadings is also proper because plaintiffs lack standing to assert a Sherman Act claim.  Proper standing is required to insure that plaintiffs suffered a direct injury and are efficient enforcers of antitrust laws.  <u>Leak v. Grant Medical Center</u>, 893 F. Supp 757, 762-763 (S.D. Ohio 1995).

Section 4 of the Clayton Act grants a private party the right to bring an antitrust action for treble damages, while §16 of that same act allows private parties to seek injunctive relief if the plaintiffs can show a significant threat of injury resulting from an antitrust violation.  <u>See</u> 15 U.S.C. §15 and 15 U.S.C. §26. Regardless of the specific relief sought, the actual or threatened harm suffered must be an antitrust injury.  <u>Brunswick Corp. V. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977); <u>Cargill, Inc. v. Monfort of Colorado, Inc.</u>, 479 U.S. 104, 111 (1986).

Related to the requirement that plaintiffs allege an antitrust

injury, the courts have also articulated five additional factors that should be analyzed in determining whether a plaintiff has established antitrust standing. <u>Southhaven Land Co., Inc. v. Malone & Hyde, Inc.</u>, 715 F.2d 1079, 1085 (6th Cir. 1983). They include: (1) a causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. <u>Id</u>.

The Sixth Circuit has said that the antitrust injury requirement and five factor standing test are two separate concepts that share the common ingredient of requiring an injury that results from restraints on competitive forces in the economy. <u>Axis v. Micafil, Inc.</u>, 870 F.2d 1105, 1111 (6th Cir. 1988). The antitrust injury requirement is less restrictive, meaning that even if an antitrust injury is shown, standing may still be denied based on the additional five factors. <u>Id</u>. However, in a later case, the Sixth Circuit concurrently discussed the antitrust injury requirement and five factors test to determine whether or not plaintiff had standing. <u>Indeck Energy Services Inc., v. Consumers</u>

16

Energy Company, 250 F.3d 972, 976-977 (6th Cir. 2000).  In this case, the facts as alleged create a significant overlap between these two concepts; therefore this court will adopt the approach used in Indeck Energy Services.

An antitrust injury is defined as an injury of the type which the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful.  Brunswick Corp, 429 U.S. at 489.  As further explained in Brunswick,

> The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

See id. (citing Zenith Radio Corp. v Hazeltine Research, 395 U.S. 100, 125 (1969)).  The presence of an antitrust injury is essential because:

> Otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability.

See Indeck Energy Services, 250 F.3d at 976.  In describing the type of cases that should be denied standing, the court further commented:

> The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.

See id. (citing Valley Products Company, Inc. v. Landmark, A Div.

17

Hospitality Franshise Sys., Inc., 128 F.3d 398, 402 (6th Cir. 1997)).

In this case, plaintiffs do not allege that the non-competition agreements are anticompetitive for any reason other than they were induced by fraud. Fraud is not an antitrust violation. Thus, plaintiffs' claimed antitrust injury, the inability to compete in the marketplace, while arguably linked to an alleged violation of the antitrust laws, does not flow directly from conduct that is itself an antitrust violation.

Plaintiffs argue that because the agreements were fraudulently induced, they serve no legitimate business purpose and operate as naked restraints on competition. Plaintiffs further argue that because the agreements operate as naked restraints on competition, they have an unreasonable anticompetitive effect, which creates an antitrust injury. As discussed below, plaintiffs' argument is unpersuasive.

Plaintiffs allege antitrust injury stemming from their status as "potential competitors" in the marketplace. In Indeck Energy Services, the plaintiffs alleged harm as a competitor in the marketplace. 250 F.3d at 977. In denying the plaintiffs standing the court said:

> Although antitrust actions may, of course, be initiated by marketplace competitors, those actors in the economic forum must at least allege the exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative. The record in this

> appeal presents no indication that *competition* itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal antitrust jurisdiction over this matter.

See id. (emphasis in original).

Here, plaintiffs have failed to allege that their exclusion from the market resulted in the elimination of a superior product or lower cost alternative and no allegation has been made that competition itself has been harmed in any way by the defendants' acts.

Moreover, plaintiffs' allegation of antitrust injury and standing is further undermined by their failure to adequately allege that they are even competitors in the market.  The Sherman Act protects "serious potential competitors as well as the established business."  Huran Valley Hospital, Inc., v. City of Pontiac, 666 F.2d 1029, 1033 (6th Cir. 1981).  A serious potential competitor must establish both the intention and preparedness to compete. Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C. Cir. 1977) ("Courts must attempt to distinguish the serious potential competitor who has been illegally kept out of the market from the inchoate business enterprise with a mere hope of entry.")

Plaintiffs allege that they intend to compete with LBC in the relevant market and call themselves "potential competitors." However, plaintiffs do not allege that they are in any way prepared to compete.  Plaintiffs fail to allege any actions, steps, plans,

19

or even the capability to compete in the relevant market. Plaintiffs' naked assertion that they intend to compete is simply not enough to establish themselves as "serious potential competitors" as that term has been defined.

Plaintiffs' injury is a direct result of defendants' alleged fraud, not a violation of antitrust laws. Moreover, plaintiffs failed to allege how competition has been adversely effected and failed to allege that they are competitors in the relevant market. Based on these failures, plaintiffs have not alleged an antitrust injury and any injury suffered by plaintiffs is simply too indirect and the damages are too speculative for this court to grant antitrust relief.

### IV. Conclusion

For the foregoing reasons, defendants' motion for judgment on the pleadings is granted with respect to plaintiffs' Sherman Act claims. Plaintiffs' remaining claims were brought under state law invoking this court's supplemental jurisdiction pursuant to 28 U.S.C. 1367(a). Having dismissed plaintiffs' Sherman Act claims, this court declines to exercise jurisdiction over the remaining claims under 28 U.S.C. 1367(c)(3). Therefore, this court will not address defendants' motion for partial summary judgment.

The clerk shall enter final judgment in favor of defendants on plaintiffs' Sherman Act claims, dismissing those claims with

20

prejudice.  Costs shall be taxed against plaintiffs.  This court declines jurisdiction over plaintiffs remaining state law claims and those claims are dismissed without prejudice.

It is so ORDERED.


                                        s/James L. Graham
                                        JAMES L. GRAHAM
                                        United States District Judge


        DATE: October 24, 2005